IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SARAH TAYLOR** : | |
| : | |
| **v.** : | **CIVIL ACTION NO. 16-1218** |
| : | |
| **COMHAR, INC.** : | |

**McHugh, J.**                                                                                                                             **August 30, 2021**

**MEMORANDUM**

      This is an action under the False Claims Act.  Relator Sarah Taylor, a licensed nurse, alleges that Defendant Comhar, Inc., which operates treatment facilities for disabled individuals, fraudulently billed Medicare and Medicaid for substandard care.  Taylor also claims that she faced illegal retaliation after reporting Defendant's violations of treatment standards.

      The False Claims Act protects governmental funds and property from fraudulent claims, and the Supreme Court has cautioned that it does not serve as "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Services, Inc. v. U.S. and Mass., ex rel. Julio Escobar and Carmen Correa*, 136 S. Ct. 1989, 2003 (2016).  The complaint here alleges Defendant's noncompliance with federal and state regulations but fails adequately to describe the effect these violations would have had on the government's payment decisions.  Her retaliation allegations suffer from similar deficits, as her investigation efforts centered on patient safety, not Defendant's submission of false claims.  For these reasons, the False Claims Act will not afford relief, and I will grant Defendant's motion to dismiss in full, but without prejudice.

I.      **Factual Background**

On March 16, 2016, Sarah Taylor ("Taylor" or "Relator") initiated a *qui tam* action, seeking to recover damages and civil penalties for alleged violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). Taylor averred that Defendant Comhar, which operates residential treatment facilities for disabled individuals, submitted thousands of false claims to Medicare and Medicaid and retaliated against Taylor after she reported Defendant's subpar services. *See* Compl. ¶¶ 1, 8, ECF 1.

Taylor, a licensed professional nurse, was employed at a facility operated by Defendant on Allegheny Avenue in 2015; previously, she worked on a contract basis at Defendant's York Street facility in 2013. *Id.* ¶¶ 22, 23, 24. In May 2015, Taylor discovered that Defendant's Allegheny Avenue facility was routinely understaffed; on August 14 and 15, 2015, only one nurse was on duty, and this nurse allegedly did not know how to properly administer residents' medication. *Id.* ¶ 47. As a result of these staffing issues, Taylor asserts that "residents did not receive their required medications for an entire weekend." *Id.*

Additionally, some residents with significant intellectual disabilities require "one-on-one" care. *Id*. ¶ 48. Yet low staffing meant that Defendant allegedly failed to comply with these requirements, which led to "instances of neglect, injury, and abuse." *Id.* ¶ 49. Taylor claims that a staff member, Ciyanna Leach,[1] was "regularly seen sleeping" on duty and, although this behavior was reported to supervisors, no action was taken to address it. *Id.* ¶¶ 51, 52. On August 17, 2015, Ms. Leach failed to supervise a resident to whom she was assigned to supervise one-on-one, which resulted in that resident harming another (by bruising her breast) when the two were left alone in

---

[1] Relator's complaint alternately refers to Ms. Leach as "Cyanni," *see* Compl. ¶ 26 and "Ciyanna," *id.* ¶ 50.

a bathroom. *Id.* ¶¶ 54–56. Although Ms. Leach wrote a report on this incident, the program director allegedly destroyed it to avoid reporting this incident to state authorities. *Id.* ¶¶ 57, 58.

Taylor identifies three additional incidents at the Allegheny facility where Defendant's staff allegedly covered up neglect and substandard services despite a duty to report injuries and medication errors. She contends that, on July 17, 2015, a supervisor, Rahemena Wilson, told Taylor that she was "expressly directed" by Defendant's Vice President, Michelle Feeney, not to disclose a medication error involving a resident (Resident K) to governmental authorities. *Id.* ¶ 60. On August 8, 2015, Ms. Leach was allegedly found asleep at the wheel of a para-transit van with the engine running and a resident in the vehicle. *Id.* And on August 13, 2015, Resident K was allegedly injured once more when their unsecured wheelchair fell over in one of Defendant's vehicles. *Id.* Taylor further claims that "no medical evaluation was sought, and no report was made to the State or any other officials." *Id.*

Taylor also alleges that she observed abuse at the York Street facility that went unreported by supervisors when she was employed there on a contract basis in 2013. She claims she witnessed residents who had received bruises due to physical mistreatment and saw nurses over-medicating residents with Ativan "to keep residents sleepy, quiet, compliant, and drugged." *Id.* ¶¶ 63, 66. It was also reported to her (albeit from an unknown source) that staff would pour water on intellectually disabled residents. *Id.* ¶ 64. But when Taylor reported the York Street facility abuse to Defendant's Vice President Michelle Feeny, although Comhar HR indicated to Taylor that she would be contacted by a state investigator, the investigators were employees of Defendant and no report was made to the State. *Id.* ¶¶ 69, 70, 72.

On this basis, Taylor alleges that the services for which Defendant submitted payment either did not occur or were of such "substandard quality that … [they] ceased to be compensable

by Medicare and Medicaid." *Id.* ¶ 77.  Taylor also asserts that Defendant failed to comply with statutes and regulations that were conditions of payment by Medicare and Medicaid and that Defendant falsified records and used its reporting line to prevent the government's discovery of their deficient services.  *Id.* ¶¶ 92, 96, 94.

The United States declined to intervene in this matter, and the complaint was unsealed and served upon Defendant.  *See* ECF No. 19, 20.  This motion to dismiss followed.

## II.    Standard of Review

Within the Third Circuit, motions to dismiss under Fed. R. Civ. P. 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  In cases brought under the FCA, claimants alleging fraud must also meet the higher pleading standard of Federal Rule of Civil Procedure 9(b), which requires a relator to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  In interpreting the "particularity" standard, the Third Circuit has held that "it is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Foglia v. Renal Ventures Management, LLC*, 754 F.3d 153, 156–157 (3d Cir. 2014).  This requires a relator to allege "all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue."  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).

**III.     Discussion**

A. Retaliation

Section 3730(h) of the FCA, 31 U.S.C. § 3730(h), protects relators against retaliation. It requires Taylor to allege that (1) she engaged in "protected conduct," that is, acts done "in furtherance of" a False Claims action, and (2) that she was "discriminated against because of" her protected conduct. *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001). Protected conduct includes "investigation for, initiating of, testimony for, or assistance in" a False Claims Act suit," which "can include internal reporting and investigation of an employer's false or fraudulent claims." *Id.* at 186–187.  But because the FCA is directed to fraud against the government, the Third Circuit has distinguished between investigations of noncompliance and investigations of fraud, stating that "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations" does not establish that he engaged in protected conduct. *Id.* at 188 (quoting *U.S. ex rel Yesudian v. Howard University*, 153 F.3d 731, 740 (D.C. Cir. 1998)).  To be protected by the FCA, "the plaintiff's investigation must concern 'false or fraudulent' claims." *Yesudian*, 153 F.3d at 740.

Ms. Taylor argues that her actions "in repeatedly protesting inadequate staffing, care and abusive practices [were] protected activity." Compl. ¶ 109.  I cannot agree; Taylor's conduct, while admirable, was not protected under the FCA because her efforts were clearly directed to ameliorating noncompliance, not fraud.  She pleads that, during the course of her employment, she reported "inadequate staffing levels, inadequate patient care, missing drugs, and the abuse of patients, as well as the impact of all those issues on patient care." Compl. ¶ 25.  This is reflected in an email she attached to her complaint, where Taylor indicated she was reporting because "[n]urses are suppose[d] to look out for the safety of these residents" and included a list of incidents

5

where substandard care had allegedly been provided. Compl. Ex. B, at 29. Taylor does not appear to have personally investigated Defendant's billing practices or complained about the submission of fraudulent claims to the government. Because her investigatory activity was not directed to uncovering fraud and lacked a nexus to the FCA, I will grant Defendant's motion to dismiss her retaliation claim. *See U.S. ex rel Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) (holding that activity was not protected as the relator "was not trying to recover money for the government; she was attempting to get classroom teachers into IEP evaluation sessions").

B. FCA Claims

Taylor also seeks to recover civil damages and penalties pursuant to 31 U.S.C. § 3729(a)(1)(A)-(C). *See* Compl. ¶ 102. To state a claim under § 3729(a)(1), a relator must show that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Hutchins*, 253 F.3d at 182. "There are two categories of false claims under the FCA: a factually false claim and a legally false claim." *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011), *abrogated on other grounds*. Factually false claims arise when a defendant "misrepresents what goods or services that it provided to the Government." *Id.* A claim is considered legally false when a defendant "knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *Id.* Legally false claims may be express or implied. *Id.*

In this matter, Relator brings (1) a factually false claim that Defendant provided worthless services and (2) a claim of implied false certifications of compliance with federal and state regulations.[2] For the reasons articulated below, Taylor's claims will be dismissed.

---

[2] Relator argues that "Defendants violated the False Claims Act by submitting legally false claims that expressly and impliedly certified that Defendants complied with federal, state, and local regulations when

1. <u>Factually False Worthless Services Claim</u>

Ms. Taylor first attempts to fit her allegations regarding Defendant's negligent care into the FCA by pleading that "[i]n spite of providing such worthless and substantially diminished services, Defendant continued to submit thousands of false claims for payment to the federal and state-funded Medicare and Medicaid programs." Compl. ¶ 6.[3]

Although the Third Circuit has not addressed the "worthless services" theory of liability under the statute, several circuits recognize it as a viable concept. *See e.g.*, *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 709–10 (7th Cir. 2014); *Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001), *abrogated on other grounds*, 136 S.Ct. 1989 (2016); *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468–69 (6th Cir. 2011); *U.S. ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 824 (8th Cir. 2009). But where it is recognized, "the performance of the service [must be] so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes*, 274 F.3d at 703. It "is not enough to offer evidence that the defendant provided services that are worth some amount less than the services paid for. That is, a 'diminished value' of services theory does not satisfy this standard. Services that are 'worth less' are not 'worthless.'" *Absher*, 764 F.3d at 710. This line of cases led a panel of the Third Circuit, in a non-precedential decision, to observe that "[c]ase law in the area of 'worthless services' under the FCA addresses instances in which either

---

Defendants had not." Relator's Resp. Opp'n to Def.'s Mot. Dismiss at 14, ECF 30. Her discussion, however, is limited to a claim for an implied false certification. *Id.* at 21. Because Taylor's pleadings do not offer details about the process of Defendant's certifications, I must dismiss her express false certification claim, as well as her allegations that Comhar falsified records, in violation of 31 U.S.C. § 3729(a)(1)(B).

[3] This assertion is best understood as a factually false claim, where the "claimant misrepresents what goods or services that it provided to the Government." *Foglia*, 754 F.3d at 157 (citing *Wilkins*, 659 F.3d at 305).

7

services literally are not provided, or the service is so substandard as to be tantamount to no service at all." *In re Genesis Health Ventures, Inc.*, 112 Fed. Appx. 140, 143 (3d Cir. 2004).

Ms. Taylor's allegations regarding Defendant's staffing shortages at the Allegheny Avenue facility do not meet this demanding requirement. Many of Taylor's assertions relate to subpar services delivered by one staff person—Ciyanna Lynch—who was observed to be sleeping on duty and failing to properly supervise residents. *See* Compl. ¶¶ 51, 57. Taylor also describes three additional incidents where a temporary nurse mismanaged medication over the weekend; where staff made a medication error with respect to one patient; and where that resident's wheelchair flipped over. *See* Compl. ¶¶ 47, 60. But had Defendant provided truly worthless services to its severely disabled residents, "the evidence would establish that its patients essentially went untreated, thereby presumably causing serious deterioration of their condition or death." *U.S. ex rel. Cooper v. Gentiva Health Servs., Inc.*, No. 01-508, 2003 WL 22495607, at *12 (W.D. Pa. Nov. 4, 2003). Taylor's complaint does not raise such an inference; to the contrary, as she observed in an email to Defendant, she was "just glad a resident has not been seriously harmed." Compl. Ex. B, at 29.

Taylor relies upon *U.S. v. N.H.C. Healthcare Corp,* 115 F. Supp. 2d 1149, 1153 (W.D. Mo. 2000), but the relator there provided detail about the reimbursement model that is lacking here. The Government's allegations of abuse in *N.H.C. Healthcare* were also significantly more detailed and serious. *Id.* at 1151 (stating that residents "developed pressure sores, incurred unusual weight loss, were in unnecessary pain, were generally not given care up to the standards required under the Medicare and Medicaid programs, and ultimately died because of this care"). Because

Relator's allegations, by contrast, are more suggestive of negligence than worthless services,[4] I will grant Defendant's motion to dismiss.

That leaves Taylor's more serious claims against Defendant at the York facility, but she has also failed to plead these with sufficient particularity. Her complaint includes allegations that employees physically abused residents and overmedicated them. Compl. ¶¶ 63–66. She avers that she reported these incidents to Defendant, but her complaint does not include information as to the frequency of the alleged abuse, the identities of the perpetrators and residents, the overall level of care provided to the residents, and whether Defendant sought Medicare and Medicaid reimbursement for services provided to the harmed residents. *See U.S. ex rel. Moore & Co., P.A.*, 812 F.3d at 307 (stating that under Rule 9(b), a relator must provide the "who, what, when, where, and how of the events at issue"). Such vague pleadings do not sufficiently define the alleged fraud. *See Foglia*, 754 F.3d at 158. And without additional information, I cannot determine the value of Defendant's services and the extent to which Defendant attempted to submit fraudulent claims to the government. *Id.* at 156. I will therefore also grant Defendant's motion to dismiss as to this claim.

2. Implied Certification

Ms. Taylor's last claim arises under an implied certification theory. When a defendant submits a claim for payment, it impliedly certifies compliance with the conditions of payment. *See Escobar*, 136 S.Ct. at 1995. If a submitted claim "fails to disclose the defendant's violation of a

---

[4] *See DePaul Health System*, 454 F.Supp.3d at 496 (concluding that the "line beyond which substandard services become worthless services is defined by gross negligence"); *Absher*, 764 F.3d at 710 (noting that "[i]t is not enough to offer evidence that the defendant provided services that are worth some amount less than the services paid for … services that are 'worth less' are not 'worthless'"); *U.S. ex rel. Swan v. Covenant Care, Inc.,* 279 F.Supp. 2d 1212, 1221 (E.D. Cal. 2002) (rejecting worthless services claim because plaintiff "only challenge[d] the level of care and the amount of services received which the patients received as a result of the alleged under-staffing").

material statutory, regulatory, or contractual requirement … the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)." *Id.* This principle is subject to an important limitation: the noncompliance must be material, meaning that the government "would not have paid these claims, had it known of these violations." *Id.* at 2004.

Relator contends that Defendant's certifications to Medicare and Medicaid were made false by their noncompliance with Medicare and Medicaid's "professionally recognized standards of care" requirements. Compl. ¶ 83 (citing 42 U.S.C. § 1320c-5(a)(2)). First, she claims that Defendant failed to adhere to the minimum standards of participation in Medicare and Medicaid (which include freedom from unnecessary drugs and physical abuse). *Id.* ¶ 87 (citing 42 C.F.R § 483.420). Second, she alleges that Defendant failed to establish systems to accurately dispense medication. *Id.* ¶ 90 (citing 42 C.F.R § 483.460(k)(2)). And finally, she avers that Defendant failed to report abuse and mistreatment, in violation of state and federal law. *Id.* ¶ 88. Unlike the allegations involving the York facility, Relator has sufficiently identified examples of negligent conduct at Allegheny Avenue that would appear to violate program regulations.

Even so, the complaint is deficient, as she has not adequately pleaded that compliance with the above regulations was material to the Government's payment decision. In assessing materiality, courts have been instructed to consider "evidence that the defendant knows that the Government consistently refuses to pay claims ... based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar*, 136 S.Ct. at 2003. Taylor's allegations in this regard are wholly conclusory—without elaboration, she contends only that Defendant knew or should have known that "such services were worthless or of such diminished value that the United States would not have paid the claims, but for Defendants' misrepresentation and fraud." Compl. ¶ 16. Because Relator pleads no other facts to support her allegations that

these requirements are material to the Government's payment decision, I will dismiss the complaint.  *See United States v. Kindred Healthcare*, 469 F.Supp. 3d 431, 450 (E.D. Pa. 2020) (stating that a "relator's references to boilerplate language conditioning payment under Medicare and Medicaid on compliance with all laws and regulations are not sufficient to satisfy the demanding standard established in *Escobar*").

### IV.     Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss will be granted, and Relator's claims will be dismissed without prejudice, with leave to amend within 21 days.  An appropriate order follows.

    /s/ Gerald Austin McHugh
United States District Judge