IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>*ex rel* **SARAH TAYLOR**<br><br>*Plaintiffs*<br><br>v.<br><br>**COMHAR, INC.**<br><br>*Defendant* | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:    **Civil Action No.: 16-cv-1218**<br><br>**JURY TRIAL DEMANDED** |

### FIRST AMENDED COMPLAINT

Plaintiff/Relator Sarah Taylor brings this *Qui Tam* action to recover treble damages and penalties pursuant to the Federal False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* ("FCA") and alleges as follows:

### INTRODUCTION

1. This is a *Qui Tam* action brought by plaintiff, Sarah Taylor ("Ms. Taylor") for herself and on behalf of the United States to recover damages and penalties arising from Defendants' knowing submission of thousands of false claims to the Medicare and Medicaid programs for services they purported to provide to the severely disabled residents at COMHAR, Inc.'s residential treatment facilities.

2. COMHAR, Inc. represents itself as "Quality Care by Caring Professionals."

3. COMHAR, Inc. continually represents itself as a creating "an environment of trust and support . . . [partnering] with people of all ages with mental illness, addiction, HIV/Aids and/or intellectual disabilities and support them in their journey *toward* **healthier, more independent, more fulfilling lives**." (emphasis in original) (*see* a true and correct copy of the COMHAR Website

attached hereto as Exhibit "A.")

4. In fact, as described herein, Defendant's facilities provided *substandard* care and submitted claims for services that were not provided, were provided in such a manner as to be substandard and worthless, and otherwise violated numerous federal, state and local laws and regulations.

5. As a result of the substandard and worthless services, residents at COMHAR's facilities were subjected to serious physical harm as a result abuse, neglect and the over-application of medication in order to dull their senses and keep them tired and docile.

6. In spite of providing such worthless and substantially diminished services, Defendant continued to submit thousands of false claims for payment to the federal and state-funded Medicare and Medicaid programs.

7. In addition to submitting false claims for payment, Defendant went to great lengths to conceal the substandard care.

8. Defendant undermined potential whistleblowers by providing them with numbers for a "Reporting Line" to call that purported to be an outside, third-party that governed and oversaw compliance with state regulations and that guaranteed that no retaliation occured against a reporting employee. That Reporting Line neither guaranteed compliance, nor guaranteed freedom from retaliation, as Ms. Taylor reported to that line several times regarding the worthless and substandard services provided at both facilities that she worked in (the York Street and Allegheny Ave Facilities) and was retaliated against and terminated *twice* for such reporting.

9. In addition, COMHAR repeatedly assured Ms. Taylor, during her previous employment there that they were investigating the issues set forth below in the York Street facility and that representatives from the Commonwealth of Pennsylvania would contact her. Upon information and

belief, no such governmental agencies were ever contacted by COMHAR regarding the abuse in the York Street facility.

10. Instead, COMHAR had employees present themselves as "investigators" and took complaints regarding the substandard care. Such investigators clearly implied a connection to governmental agencies and never informed Ms. Taylor that they were in fact COMHAR employees.

11. COMHAR employed such "investigators" to conceal Defendant's scheme of providing abusive, neglectful and substantially worthless care to its residents in order to collect Medicare and Medicaid reimbursements and payments.

12. As set forth more fully herein, Defendant further instructed its employees to turn a blind eye to employees' mistreatment and neglect of the residents and to avoid making incident reports at every turn.

13. Defendant further instructed employees to falsify medical records.

14. Defendant further had inappropriate staffing levels and staffing participation in resident care. As set forth more fully below, on multiple occasions key personnel would be hours late to the facility and would sleep during their shifts. As a result of such inappropriate staffing levels and participation, employees of COMHAR ***would give residents medications early, combine medications that were required to be given at different times and leave nursing techs entirely unsupervised in violation of state law.*** Each of these actions significantly increased the chance of harm to the residents.

15. Further, where COMHAR employees did report the neglect and abuse endured by the residents, Defendant fired employees in an effort to silence those employees. Defendant retaliated against Ms. Taylor on ***multiple occasions*** for reporting the mistreatment of residents that Defendant willfully ignored for months. Such retaliation included, but was not limited to the termination of Ms.

Taylor when she was formally employed by COMHAR, as well as the reduction of her hours to *zero* when she was assigned to COMHAR as temporary staff through OMNI staffing.

16. Defendant, at all times, knew or should have known such services were worthless or of such diminished value, that the United States would not have paid the claims, but for Defendants' misrepresentation and fraud.

17. In connection with the filing of this Complaint, Ms. Taylor will furnish the United States with the Disclosure Statement required by 31 U.S.C. § 3730(b)(2) consisting of substantially all of the material evidence and information in her possession relating to her claims.

18. Ms. Taylor is the original source of the facts and information contained in this Complaint and is voluntarily providing that information to the Federal Government at the time of filing this action.

## JURISDICTION AND VENUE

19. This is a civil action arising under the laws of the United States, specifically, the "False Claims Act" or "FCA." This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337.

20. Venue is proper in this district pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391 because Defendant committed acts prohibited by 31 U.S.C. § 3729(a) in this district, including their submission of false claims for payment as described herein to the various Government agencies and contractors.

21. Further, Defendant COMHAR maintains a business office and other facilities in this district and all of the COMHAR residential facilities are located in this district and are actively advertised the services at issue in this Complaint in this district.

## THE PARTIES

22. Ms. Taylor is a citizen of the United States and resident of the State of New Jersey. Plaintiff is a Licensed Professional Nurse ("LPN"). She was employed by COMHAR and assigned to COMHAR as temporary staff on multiple occasions and was retaliated against on each of those occasions for reporting illegal actions by COMHAR and abuse and neglect of the COMHAR residents.

23. In or about 2013, Ms. Taylor was employed on a contract basis as an LPN at COMHAR's residential treatment facility at York and Aramingo Avenue ("York Street Facility").

24. In or about May 12, 2015, Ms. Taylor was again employed as an LPN at Comhar's residential treatment facility at Allegheny Avenue Intermediate Care Facility for the Mentally Retarded ("Allegheny Ave Facility.")

25. During the course of her employment, Ms. Taylor repeatedly complained to management of COMHAR about inadequate staffing levels, inadequate patient care, missing drugs and the abuse of patients, as well as the impact of all those issues on patient care.  (See Emails to Supervisor attached hereto as Exhibit "B.")

26. Ms. Taylor final complaint came after learning that her complaints regarding at least one of her co-workers, Cyanni Leach, ("Ms. Leach") were not being addressed.  Ms. Leach was engaged in activities that were detrimental to patient care.  After Ms. Taylor made this complaint, she was essentially terminated by having her hours reduced to zero.

27. Defendant COMHAR, Inc. is a non-profit corporation formed under the laws of the Commonwealth of Pennsylvania.  Defendant COMHAR may be served at 100 W. Lehigh Avenue, Philadelphia, PA 19133.

## FACTUAL BACKGROUND

## THE MEDICARE AND MEDICAID PROGRAMS

28.     Medicare is a federally-funded health insurance program for persons 65 years and older and for certain disabled persons. 42 U.S.C.A. §1395 (Title XVIII of the Social Security Act). The Center for Medicare and Medicaid Services (CMS) is responsible for administration of the Medicare program. Currently, Medicare provides insurance coverage to approximately 40 million Americans.

29.     The Medical Assistance program ("Medicaid") is a joint federal-state program funded under Title XIX of the Social Security Act. The Medicaid program is designed to pay for health care services for the poor. Under Medicaid, the state directly pays health care providers for services rendered to Medicaid recipients and then obtains the federal share of the payment from accounts drawn on funds of the U.S. Treasury. In the State of Pennsylvania, the Department of Public Welfare (now named the Department of Human Service ("DHS")) administers the Medicaid program. DHS oversees and monitors compliance with the various laws and regulations designed to protect the health and safety of Pennsylvania patients. CMS oversees the Medicaid program at the federal level.

30.     Medicare and Medicaid programs pay for residential treatment facilities, nursing home care and intermediate care facilities for their beneficiaries.

31.     Facilities that wish to provide services to these beneficiaries must meet and maintain the minimum staffing, quality of life and other requirements set forth in the Social Security Act as well as all applicable federal and state statutes, regulations, requirements and standards.

32.     Failure to maintain state and federal requirements and standards can result in the denial of payments by the Medicare and Medicaid programs.

33.     Indeed, the United States Attorneys' Office has prosecuted and settled many FCA cases that arise from a failure to maintain state and federal requirements, and have resulted in worthless

services.

34. In May 2021, the USAO settled a case with SavaSeniorCare, LLC arising from the provision of care that failed to meet minimum state and federal requirements, including a failure to properly staff a skilled nursing facility, the provision of substandard medical care, and the provision of preventable medication errors.

35. Accordingly, it is clear that the United States Government conditions payment of Medicare and Medicaid reimbursements on maintaining state and federal requirements.

36. As set forth more fully below, Defendant has submitted false claims since 2013.

**DEFENDANT FAILS TO PROVIDE THE VERY BASIC NECESSITIES FOR RESIDENT QUALITY OF LIFE AND CARE, YET CONTINUE TO SUBMIT BILLS TO MEDICARE AND MEDICAID FOR PAYMENT**

37. Defendant submitted false claims for payment by Medicare and Medicaid when they sought payment for 1) services that were not provided; and 2) for care and services that Defendants provided to residents of the York Street and the Allegheny Avenue facilities that were so deficient, inadequate, and substandard as to constitute worthless services. Defendants failed to provide the very basic necessities required for each resident, such that each resident went essentially untreated, which caused substantial deterioration in many resident's conditions as set forth more fully below. Defendant further allowed its employees to abuse such residents and ignored all complaints regarding such abuse.

38. Further, in an effort to conceal the abuse and neglect that was rife within Defendant's facilities, it established a fraudulent "Reporting Line" which purported to connect to a third-party to provide oversight on COMHAR's compliance with state and federal law and regulations. Employees were encouraged to utilize the Reporting Line with the understanding that no retaliation would occur.

39. However, retaliation did occur because employees who used the Reporting Line, like

Ms. Taylor, were then penalized and terminated for utilizing the Reporting Line.

40. Further, Defendant failed to provide the minimal staff for services that it purported to offer.

41. The Allegheny Ave Facility is an Intermediate Care Facility for The Mentally Retarded ("ICF").

42. Federal law requires ICFs to comply with minimum standards in order to remain eligible for payment under the Medicaid program.

43. Such minimum standards are set forth in 42 CFR 483.400—483.480

44. In addition, Pennsylvania state law expressly incorporates "42 CFR 483.400—483.480 as the licensing regulations for [ICFs]." 55 Pa. Code § 6600.3.

45. 42 CFR 483.420 sets forth specific conditions of participation related to client protection in ICF's, including:

> i. Ensur[ing] that clients are not subjected to physical, verbal, sexual or psychological abuse or punishment;
>
> ii. Ensur[ing] that clients are free from unnecessary drugs and physical restraints and are provided active treatment to reduce dependency on drugs and physical restraints;
>
> iii. Provid[ing] each client with the opportunity for personal privacy and ensur[ing] privacy during treatment care of personal needs;

46. Further, ICF's like the Allegheny Facility are bound under the conditions of participation in Medicare and Medicaid to "ensure that all allegation of mistreatment, neglect or abuse, as well as injuries of unknown source, are reported immediately to the administrator or to other officials in accordance with State law through established procedures."

47. Pennsylvania state law clearly requires that an ICF's:

> [E]mployee or an administrator who has reasonable cause to suspect that a recipient is a victim of abuse or neglect *shall* immediately make an oral report to an agency. If applicable, the agency *shall* advise the employee or administrator of additional reporting requirements that may pertain under subsection (b). An employee shall notify the administrator immediately following the report to the agency.
>
> Within 48 hours of making the oral report, the employee or administrator *shall* make a written report to the agency. The agency shall notify the administrator that a report of abuse has been made with the agency.

35 Pa. Stat. Ann. § 10210.501 (West)

48. Further, pursuant to 42 CFR 483.460(k) ICFs like the Allegheny Ave Facility must "have an organized system for drug administration that identifies each drug up to the point of administration. The system must assure that . . . [a]ll drugs, including those that are self-administered, are administered *without error*."

49. Accordingly, in order to continue to participate and receive payments from Medicare and Medicaid, COMHAR's facilities must be compliant with Pennsylvania State Law, as well as the regulations set forth in 42 CFR 483.400—483.480.

50. The Allegheny Ave Facility utterly failed to comply with these responsibilities, including failing to properly administer drugs and failing to report neglect and abuse despite its obligations.

51. In May 2015, while Ms. Taylor was employed at the Allegheny Ave Facility, she discovered that Defendant operated the facility in a manner that routinely went without the necessary staff which impacted its ability to appropriately administer drugs.

52. Such a failure to administer drugs is a serious violation of Defendant's duties to the residents.

53. For example, on August 14 and 15, 2015 the Allegheny Ave Facility had only one

nurse on duty. That nurse did not know where any of the residents' medications were, or what medications were to be given out. As a result of the lack of necessary staff, *residents did not receive their required medications for an entire weekend.*

54. The lack of adequate staffing is a failure to provide services, and any attempt to collect fees for such non-existent services is a violation of the FCA.

55. Indeed, just recently in May 2021, the USAO for the Eastern District of Pennsylvania just settled a case against SavaSeniorCare, LLC which alleged – among other things – that a lack of adequate staffing is a violation of the FCA.

56. As a result, it is clear that a lack of adequate staffing would be material to the United States Government's decision to pay COMHAR – and in fact, it would cease payments if it had known.

57. Further, as many of the residents at COMHAR's Allegheny facility have significant intellectual disabilities, some of the residents require a staff member that is dedicated "one-on-one" to them for the entirety of the day.

58. Respondent found that the staff at COMHAR's Allegheny facility routinely failed to comply with their one-on-one duties which led to instances of neglect, injury and abuse.

59. In particular, Ciyanna Leach was routinely assigned one-on-one duties and failed to stay one-on-one with her resident.

60. Ciyanna Leach was regularly seen sleeping when she was supposed to be one-on-one with residents.

61. This behavior was reported on numerous times to Vice-President Michelle Feeny as well as Rahemena Wilson who refused to confront Ms. Leach on her behavior and instead actively protected her in violation of State and Federal Law.

62.     This protection extended to an incident that occurred on August 17, 2015 where two residents were injured as a result of Ms. Leach's failure to comply with her duties, as well as Defendant's acqueisance in that failure and Defendant's failure to put in place proper reporting procedures.  In fact, the reporting procedures were so deficient that staff were **never trained** how to report any such issues at the negligible orientation that employees attended prior to working in the Allegheny facility.

63.     On August 17, 2015, two female residents were in a bathroom at the same time.  One of the residents required one-on-one care but was not being supervised by her assigned caretaker Ms. Leach and harmed the other resident.

64.     Ms. Leach instead was violating a safety rule, as she was known to do, and as her COMHAR supervisor was well aware.

65.     When the residents were in the bathroom a female residents obtained a significant bruise on her left breast.

66.     While Ms. Leach wrote up the incident, including the resident bruises and they were in the bathroom together, not only violating safety rule but the residents 1:1 ratio, Ms. Wilson, in her capacity as the Program Director, **ripped the report up,** stating that "Cyanni Leach knows better than to report a patient-to-patient" incident.

67.     Upon information and belief, Ms. Wilson meant that such a reported incident would require a report to state authorities which could put COMHAR's Medicare, Medicaid and state grants in jeopardy.

68.     Reporting an incident that demonstrably showed a failure to comply with state and Federal standards could result in the loss of funding, as compliance with state and federal standards is a condition of payment for Medicare and Medicaid.

69. No report was ever made to any state agency, in direct violation of Federal and State law as set forth in 42 CFR 483.400—483.480 and 35 Pa. Stat. Ann. § 10210.501.

70. However, these were not the only incidents where Defendant and its Directors covered up serious risks to resident's physical and mental health as a result of their neglect and substandard services:

> i. On July 17th, Ms. Wilson reported to Ms. Taylor that she was expressly directed by the Vice President Michelle Feeny **not to disclose** a medication error to governmental authorities. The Medication error involved a resident (Resident K) that had already been injured at the Allegheny Facility. This was direct breach of COMHAR and its employees duties to report injuries and medication errors to the State. This direction was made because COMHAR had already been reported by an ER doctor for a severe burn to that Resident K's back in February 2015, and did not want to have to report yet another injury to that same patient.
>
> ii. On August 8th, Ms. Leach was found sleeping at the wheel of the para-transit van with the engine running and a resident that required one-on-one car in the back of the van.
>
> iii. On August 13th, Resident K's wheelchair was unsecured in the Comhar van and flipped over when the van moved. Resident K injured her arm, but no medical evaluation was sought and no report was made to the State or any other officials.

71. However the existence of such incidents and the cover-up of such incidents were not limited to the Allegheny Facility. Prior to her employment at the Allegheny facility, Ms. Taylor was employed on a contract basis as an LPN at their York Street Facility in 2013.

72. While working at the York Street facility, Ms. Taylor observed multiple residents being openly abused.

73. She saw residents who received bruises and black eyes from the employees.

74. It was reported to Ms. Taylor that Defendant's employees poured water on severely intellectually disabled residents.

75. It was reported to Ms. Taylor that employees were body-slamming residents.

76. Perhaps most disturbing, Ms. Taylor witnessed nurses over-medicating the residents with Ativan to keep the residents sleepy, quiet, compliant and drugged during shifts.

77. Ms. Taylor reported these incidents to the Nurse Manager of York and Allegheny. When no action was forthcoming, Ms. Taylor reported these incidents directly to Vice-President Michelle Feeny.

78. COMHAR HR contacted Ms. Taylor and stated that there was an investigation in progress and that Ms. Taylor should expect to be contacted by a state investigator.

79. Instead, Ms. Taylor was contacted by a woman who stated that she had been "assigned to investigate" the abuse that Ms. Taylor had witnessed at the York Facility. While the woman did not specifically state that she was the state investigator, Ms. Taylor assumed that she was from the conversation she had with COMHAR HR. At no point did the woman ever inform Ms. Taylor that she was an employee of COMHAR.

80. In fact, it was not until 2015 that Ms. Taylor realized that the person who presented herself as a "state investigator" was in fact a COMHAR employee. The woman never identified herself as a COMHAR employee.

81. Her complaints regarding the York Street facility were never addressed by the state.

82. Upon information and belief Ms. Taylor's complaints regarding the York Street facility were never reported to any governmental officials.

83. As a result, Defendant knew or should have known that since at least 2013 that residents of its facilities were subjected to unreasonable risks of physical and mental harm by virtue of

their neglect and diminished or substandard services.

84. However, as a result of Defendant's intentional actions to hide such actions and to conceal the fact that the Reporting Line went directly to its own employees, and was not a third-party compliance line, the Pennsylvania Department of Health and other Government agencies and inspectors were unaware of the true state of affairs and condition and health of residents at the COMHAR's facilities.

85. Such concealment allowed Defendant to avoid the denial of any of the fraudulent and worthless Medicare and Medicaid billings.

86. Further, as a result of Defendant's failures to provide required services to the residents at the COMHAR facilities, residents suffered from unsanitary, unsafe, abusive and neglectful conditions that led to injury.

87. Despite this substandard care and worthless services, Defendant continued to bill Medicare and Medicaid for "care" for the residents.

88. Accordingly, as set forth herein, the services for which Defendant submitted claims for payment to Medicare and Medicaid both a) did not occur; and b) were of such substandard quality that Defendant provision of those services was worthless and ceased to be compensable by Medicare and Medicaid.

89. Defendant have submitted such false claims since at least 2013 until the present.

90. Upon information and belief, such false claims are still being submitted.

91. As a result, Defendant is liable for each and every false claim under the False Claims Act.

92. Furthermore, in addition to submitting claims for payment for services that were not provided, Defendant's fraud is further evidenced by their failure to comply with federal and state

statutes and regulations, despite falsely certifying such compliance.

93. Pursuant to 42 U.S.C. §1395i-3(d)(4) and 42 U.S.C. §1396r-3(d)(4), Defendant is obligated to be in compliance with "all applicable Federal, State and local laws and regulations" to participate in Medicare and Medicaid reimbursements.

94. Under the Medicare and Medicaid programs, providers may submit claims only for services that are "of a quality which meets professionally recognized standards of care." 42 U.S.C. §1320c-5(a)

95. Federal law requires ICFs to comply with minimum standards in order to remain eligible for payment under the Medicaid program.

96. Such minimum standards are set forth in 42 CFR 483.400—483.480

97. In addition, Pennsylvania state law expressly incorporates "42 CFR 483.400—483.480 as the licensing regulations for [ICFs]." 55 Pa. Code § 6600.3.

98. 42 CFR 483.420 sets forth specific conditions of participation related to client protection in ICF's, including:

    i. Ensur[ing] that clients are not subjected to physical, verbal, sexual or psychological abuse or punishment;

    ii. Ensur(ing) that clients are free from unnecessary drugs and physical restraints and are provided active treatment to reduce dependency on drugs and physical restraints;

    iii. Provid[ing] each client with the opportunity for personal privacy and ensur[ing] privacy during treatment care of personal needs;

99. Further, ICF's like the Allegheny Facility are bound under the conditions of participation in Medicare and Medicaid to "ensure that all allegation of mistreatment, neglect or abuse, as well as injuries of unknown source, are reported immediately to the administrator or to other officials in accordance with State law through established procedures."

100. Pennsylvania state law clearly requires that an ICF's:

> [E]mployee or an administrator who has reasonable cause to suspect that a recipient is a victim of abuse or neglect shall immediately make an oral report to an agency. If applicable, the agency shall advise the employee or administrator of additional reporting requirements that may pertain under subsection (b). An employee shall notify the administrator immediately following the report to the agency.
>
> Within 48 hours of making the oral report, the employee or administrator shall make a written report to the agency. The agency shall notify the administrator that a report of abuse has been made with the agency.

35 Pa. Stat. Ann. § 10210.501 (West)

101. Further, pursuant to 42 CFR 483.460(k) ICFs like the Allegheny Ave Facility must "have an organized system for drug administration that identifies each drug up to the point of administration. The system must assure that . . . [a]ll drugs, including those that are self-administired, are administered *without error.*"

102. As set forth above, Defendant has failed to comply with such regulations. The inadequate services provided by the staff ensured that residents would not receive the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being. Further the intentional abuse and neglect of residents at the York Street and Allegheny Ave facilities, as well as other facilities, was non-compliant with these federal regulations.

103. As a result, Defendant is not in compliance with statutes and regulations which were conditions of payments by the Medicare and Medicaid programs, and thus each and every request for payment made by Defendants has been falsely certified.

104. The result of Defendant's persistent failures to comply with the applicable laws and failure to provide services that are "of a quality which meets professionally recognized standards of care" resulted in Defendant's submission of claims for payment for services that were not provided.

105. In addition, Defendant's creation of a "compliance" Reporting Line that purported to

ensure third-party review of Defendant's compliance with state and federal regulations and to provide protection to whistleblowers from retalaiation, but instead was manned by and reported to Defendant's own employees, was an effort to conceal such substandard and worthless services and prevent the discovery of such deficiencies.

106. As a result, *each and every request* for payment made by Defendant has been falsely certified.

107. Accordingly, Defendant submitted false claims that failed to comply with applicable state and federal regulations and in connection with their provision of substandard and/or worthless care, as detailed above. The claims for payment submitted by Defendant were also false in that they were premised on false records Defendants created to conceal their substandard services and that are relied upon by Medicare and Medicaid as a basis for payment under these programs.

## DEFENDANT'S UNLAWFUL RETALIATION AGAINST RELATOR TAYLOR

108. Ms. Taylor throughout her employment at COMHAR complained to management about the inadequate care being provided to residents.

109. Ms. Taylor's complaints and challenge to management came to a head in August 2015 when she protested Defendant's inadequate response to yet further neglect of patients and protection of Ms. Leach.

110. As a direct result and in retaliation for her repeated complaints Ms. Taylor was terminated by COMHAR.

## COUNT I
## FALSE CLAIMS ACT

111. Ms. Taylor repeats and incorporate each allegation contained above as if fully set forth herein.

112. Ms. Taylor brings this Qui Tam action on behalf of herself and the United States Government to recover damages and civil penalties under 31 U.S.C.. § 3729(a) of the False Claims Act.

113. 31 U.S.C. § 3729(a) provides, in relevant part, liability for any person who-

   (a) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

   (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

   (c) Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

114. By virtue of the acts described herein, Defendant violated 31 U.S.C. §3729(a)(1) and (2) from at least 2013 through the August 2015 and continuing through the present, and knowingly presented or caused to be presented thousands of false or fraudulent claims to CMS and DPW/DHS for Medicare and Medicaid reimbursement.

115. CMS and DPW/DHS, unaware of the Defendant's violations of §3729(a)(1) and (2) as described herein, paid or contributed to the payment of, the claims submitted by Defendants.

116. As a result of Defendant's violations of 31 U.S.C.A. § 3729(a)(1) and (2), the United States Government has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

117. Ms. Taylor is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 31 U.S.C.A § 3730(b) on behalf of herself and the United States.

**WHEREFORE,** Relator Taylor respectfully request this Court award the following damages to the following parties and against Defendants:

To the UNITED STATES:

(a) Three times the amount of actual damages which the United States Government sustained as a result of Defendant's submission of false claims;

(b) A civil penalty of not less than $6,000 and not more than $12,000 for each false claim Defendant presented or caused to be presented to the United States for payment;

(c) Prejudgment interest:

(d) All costs incurred in bringing this action.

**To RELATOR  Taylor:**

(a) The maximum amount allowed pursuant to 31 U.§.C.A. § 3730(d) and/or any other applicable provision of law;

(b) Reimbursement for reasonable expenses which Relator incurred in connection with this action; ·

(c) An award of reasonable attorneys' fees and costs; and

(d) Such further relief as this Court deems equitable and just.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Date: September 20, 2021

By: _____
*/s/ Peter R. Bryant*
Gavin P. Lentz, Esquire (53609)
Peter R. Bryant, Esquire (312328)
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
glentz@bochettoandlentz.com
pbryant@bochettoandlentz.com
*Attorneys for Plaintiff / Relator*